**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 20-4126

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

CHRISTOPHER PAUL HASSON,

        Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. George J. Hazel, District Judge.  (8:19-cr-00096-GJH-1)

Argued:  March 12, 2021                        Decided:  February 22, 2022

Before MOTZ, DIAZ, and RUSHING, Circuit Judges.

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge Motz and Judge Diaz joined.

**ARGUED:**  Cullen Oakes Macbeth, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.  Thomas Patrick Windom, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.  **ON BRIEF:**  James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant.  Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

RUSHING, Circuit Judge:

After unsuccessfully challenging the statute as unconstitutionally vague, Christopher Hasson pleaded guilty to violating 18 U.S.C. § 922(g)(3) by possessing firearms as someone "who is an unlawful user of or addicted to any controlled substance," in addition to three related counts. At sentencing, the district court increased Hasson's Guidelines range pursuant to U.S.S.G. § 3A1.4 upon concluding that his offense was intended to promote a federal crime of terrorism, and the court sentenced him to 160 months' imprisonment. On appeal, Hasson contends that Section 922(g)(3) is facially vague. He also argues that Section 3A1.4 cannot apply because he was not convicted of a federal crime of terrorism and, in any event, the district court clearly erred in applying the provision. We affirm his conviction and sentence.[1]

I.

A.

In February 2019, federal authorities arrested Hasson as he arrived for work at the United States Coast Guard Headquarters in Washington, D.C. At the time, Hasson was a lieutenant in the Coast Guard. The sworn criminal complaint charged Hasson with unlawfully possessing Tramadol, an opioid pain reliever and Schedule IV controlled substance, and possessing firearms and ammunition as an unlawful user or addict of a

---

[1] We also deny Hasson's motion to supplement his claims on appeal, which he filed three months after oral argument. *See United States v. Leeson*, 453 F.3d 631, 638 n.4 (4th Cir. 2006) (finding argument waived when it was available to the defendant at the time of his opening brief yet was raised for the first time in a notice of supplemental authority and was "wholly different" than the argument advanced in the opening brief).

controlled substance. *See* 21 U.S.C. § 844(a); 18 U.S.C. § 922(g)(3). Arresting agents found 196 Tramadol pills in Hasson's backpack and another 106 in his work desk. A simultaneous search of Hasson's residence uncovered another 122 Tramadol pills; 15 firearms; an unregistered, assembled firearm silencer; an unregistered, disassembled firearm silencer; and hundreds of rounds of ammunition. A blood sample drawn from Hasson that day showed Tramadol in his bloodstream.

In a motion to detain Hasson pending trial, the Government claimed the charges were "the proverbial tip of the iceberg." J.A. 25. According to the Government, its investigation revealed that Hasson was "a domestic terrorist, bent on committing acts dangerous to human life." J.A. 25.

The Government claimed that a draft email dated June 2, 2017—which it calls a "manifesto"—provided insight into Hasson's worldview. In it, Hasson wrote that he was "dreaming of a way to kill almost every last person on the earth" and contemplated "biological attacks followed by attack on food supply" and "[i]nstitut[ing] a bombing/sniper campaign." J.A. 879. Hasson continued:

> I don't think I can cause complete destruction on my own, However if I could enlist the unwitting help of another power/country would be best. Who and how to provoke???
>
> . . . .
>
> Liberalist/globalist ideology is destroying traditional peoples esp white. No way to counteract without violence. It should push for more crack down bringing more people to our side. Much blood will have to be spilled to get whitey off the couch. For some no amount of blood will be enough. They will die as will the traitors who actively work toward our demise. Looking to Russia with hopeful eyes or any land that despises the west's liberalism. . . .

3

Need to come off TDL, clear my head.  Read and get education have to move to friendly area and start to organize.  Get leadership within the community, sheriff, city manager, mayor, lawyer?  Not sure but start now.  Be ready.

Stockpile 5 locations.  Pack, food, GN, supporos ao, clothing, gear.  Comb/exp for defense.  Extras mortar recoilless, learn basic chemistry, start small.

By land put 3 homes and multiple hides.  Have way to get out and start hitting back.  Use lines of drift.

Have to take serious look at appropriate individual targets, to bring greatest impact.  Professors, DR's, Politian's, Judges, leftists in general.

Look up tactics used during Ukrainian civil war.  During unrest target both sides to increase tension.  In other words provoke gov/police to over react which should help to escalate violence.  BLM protests or other left crap would be ideal to incite to violence.

Gun rights people will never rise, need religious to stand up.  Please send me your violence that I may unleash it onto their heads.  Guide my hate to make a lasting impression on this world.  So be it.  I don't know if there truly is a "conspiracy" of ((((People)))) out to destroy me and mine, but there is an attack none the less.  For that reason I will strike, I can't just strike to wound I must find a way to deliver a blow that cannot be shaken off.  Maybe many blows that will cause the needed turmoil.

. . . .

J.A. 879.

Hasson penned similar sentiments in a September 2017 letter to Harold Covington, founder of a group advocating for a white ethnostate in the Pacific Northwest.  Hasson identified himself as "a long time White Nationalist, having been a skinhead 30 plus years ago before my time in the military."  J.A. 874.  Hasson voiced dissatisfaction with "mass protest or wearing uniforms marching around provoking people with swastikas," stating instead, "I was and am a man of action you cannot change minds protesting like that.  However you can make change with a little focused violence."  J.A. 874.  Hasson hoped to

4

"open a dialogue" with Covington "to coordinate efforts" in establishing a white homeland. J.A. 874.

Hasson's own writings were not the only ones to raise flags. He compiled the manifestos of mass murderers and terrorists the likes of Ted Kaczynski, Eric Rudolph, and Anders Breivik. He sent himself a Home Workshop Explosives handbook, The Anarchist Cookbook, a guide on how to make the plastic explosive Semtex, the U.S. Army Improvised Munitions Handbook, and The Terrorist's Handbook, which discussed methods of buying, preparing, and detonating various explosive substances.

Hasson's internet search history showed a similar preoccupation with violence, white nationalism, and anti-government views. He routinely sought information about groups harboring white-supremacist, militant, and anti-government beliefs. He queried information about explosives, including homemade incendiaries, plastic explosives, ricin, homemade biological weapons, explosively formed penetrators, and shaped charges, including discussions about materials for making the latter two devices. He viewed hundreds of webpages related to firearms, ammunition, and firearms accessories.

Hasson also researched the movements and whereabouts of political figures. He searched for "where do senators live dc," "do senators have ss protection," "how often are senators in dc," "how do senators and congressman get around dc," "are supreme court justices protected," "where does justice kagan live," and "where does Sonia Sotomayor live." S.J.A. 454, 1048. After viewing a headline in which Joe Scarborough (television host and former U.S. Congressman) called former President Trump "the worst ever," Hasson spent several minutes reviewing Scarborough's Wikipedia page before searching

5

"where is morning joe filmed." S.J.A. 1077–1078. His searching led him to the address for Scarborough's home, which Hasson then viewed in Google Maps.

In the Government's telling, Hasson's inquiries about specific individuals drew inspiration from Breivik's manifesto. On January 3, 2019, Hasson searched within the manifesto (saved on his Coast Guard computer) for "category A." Breivik classifies traitors as Category A, B, or C as a means of identifying priority targets. "Category A" includes influential and high-profile individuals, including political, media, cultural, and industry leaders. Two weeks later, Hasson spent three hours compiling a list of prominent politicians, activists, political organizations, and media personalities. The list contained 22 entries. That same day, Hasson searched the Internet for "best place in dc to see congress people" and "where in dc to [sic] congress live." S.J.A. 1089.

Hasson allegedly followed Breivik's manifesto in other ways too. He visited an internet forum on energetic materials and reviewed discussions on manufacturing explosives. He searched the manifesto for "steroids" and reviewed a section encouraging assailants to use them in preparation for attacks. In the same spreadsheet containing his list of individuals and organizations, Hasson devised a possible steroid cycle. Agents searching Hasson's home recovered over thirty bottles labeled as human growth hormone inside a locked container, five vials of testosterone, and mestanolone (an anabolic steroid) in both pill and powder form.

Hasson also amassed weapons and tactical gear. In addition to the 15 firearms authorities found at Hasson's home, in a three-year period Hasson spent roughly $12,000 on holsters, knives, ammunition magazines, ammunition, handguards, camping supplies,

6

Meals-Ready-to-Eat, body armor plates, plates carriers, tactical vests and pouches, firearm repair kits, firearm components, and smoke grenades. Among those purchases were metal parts with pre-indexed holes ready to be drilled and assembled into unlawful silencers. Hasson purchased a drill press and fully assembled one of the silencers, which he test-fired at least once.

In December 2017, Hasson registered for an online sniper and sharpshooter forum, purchased scopes for precision long-range shooting, and bought a Bergara Hunting and Match Rifle, outfitting it with one of the scopes and a bipod. An FBI sniper testified that the Bergara rifle "can be used to precisely target large animals including human beings from long distances, particularly with the addition of a scope to enable precision sighting at distance and a bipod to stabilize the rifle while shooting." S.J.A. 657. Hasson's rifle was chambered in "one of the most commonly used calibers of rifle employed by U.S. military and especially law enforcement snipers both for its accuracy as well as its terminal effectiveness in the body." S.J.A. 657.

The necessary instruments in hand, Hasson educated himself on precision long-range shooting. While at work, Hasson reviewed a document authored by a well-known expert on sniper training and operations. The document taught readers how to use a scoped rifle to precisely engage targets up to hundreds of yards away. Hasson obtained examples of a "sniper data book," which, according to the FBI sniper, shooters use to document the performance of a particular rifle in different shooting conditions. He then took his rifle to a gun range, test fired it from various distances, and recorded his observations in a journal. Hasson later conducted further research on distance shooting, searching for "how to use

7

trig to calculate distance," "size of door usa," "size of garage usa," and "stop sign height." J.A. 885; S.J.A. 1032. As the FBI sniper explained, these searches reference methods a trained sniper may use to quickly determine his distance from a target. Hasson also sent himself a ballistics calculator spreadsheet, which assists in accurately hitting an intended target at a given distance.

B.

The Government's forecast of additional, more serious charges did not come to fruition. A grand jury ultimately indicted Hasson for unlawful possession of unregistered firearm silencers, 26 U.S.C. § 5861(d); unlawful possession of firearm silencers unidentified by serial number, 26 U.S.C. § 5861(i); possession of firearms by an unlawful user of and addict to a controlled substance, 18 U.S.C. § 922(g)(3); and possession of a controlled substance, 21 U.S.C. § 844(a).

Hasson moved to dismiss the Section 922(g)(3) charge, arguing that the statutory phrases "unlawful user" and "addicted to" were unconstitutionally vague on their face. The district court denied the motion. *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *6–7 (D. Md. Sept. 20, 2019). As the court recognized, our precedent forecloses facial vagueness challenges by defendants whose conduct a statute clearly proscribes. *Id.* at *6 (citing *United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016)). Hasson did not "seem to contest that his alleged conduct falls squarely within the confines of the statute," and the district court found that Hasson's conduct was "clearly prohibited by § 922(g)(3)'s prohibition on possession of firearms by an individual whose drug use is consistent, prolonged, and close in time to his firearm possession." *Id.* at *7; *see United*

8

*States v. Sperling*, 400 Fed. App. 765, 767 (4th Cir. 2010) ("To sustain a conviction [under Section 922(g)(3)], the government must prove that the defendant's drug use was sufficiently consistent, prolonged, and close in time to his gun possession to put him on notice that he qualified as an unlawful user under the terms of the statute." (internal quotation marks omitted)). Thereafter, Hasson pleaded guilty to all counts but reserved the right to appeal his sentence and the order denying his motion to dismiss.

The district court held a full-day sentencing hearing. Of note here, the court resolved the Government's request to enhance Hasson's Guidelines range under U.S.S.G. § 3A1.4. The Section 3A1.4 adjustment directs courts to increase a defendant's offense level and criminal-history category "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). The district court applied the adjustment over Hasson's objection upon concluding that his crimes were "designed to promote" a crime under 18 U.S.C. § 351, which, in relevant part, criminalizes "attempting to kill or kidnap" any member of Congress, any Supreme Court Justice, and certain executive officials. S.J.A. 951–955. Applying the adjustment increased Hasson's offense level by 12 points and his criminal-history category from I to VI. The district court, however, agreed with Hasson that the increase overstated his criminal history and departed downward to category I. In the end, the adjustment increased Hasson's Guidelines range from 41–51 months to 151–188 months. The court sentenced Hasson to 160 months' imprisonment.

## II.

On appeal, Hasson again challenges 18 U.S.C. § 922(g)(3) as unconstitutionally vague on its face. But Hasson does not dispute the district court's holding that his conduct "falls squarely within the confines of [Section 922(g)(3)]." *Hasson*, 2019 WL 4573424, at *7. He has, consequently, abandoned any contention to the contrary. *See Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 290 (4th Cir. 2018) ("'[C]ontentions not raised in the argument section of the opening brief are abandoned.'" (quoting *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004))).

That abandonment dooms Hasson's vagueness challenge. The Supreme Court and this Court have repeatedly held that we must "consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010) (alteration in original) (quoting *Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)); *see Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151–1152 (2017) ("A plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." (brackets and internal quotation marks omitted)); *Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *United States v. Moriello*, 980 F.3d 924, 931 (4th Cir. 2020) ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (internal quotation marks omitted)); *Hosford*, 843 F.3d at 170 (same); *United States v. Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011)

10

(same); *Gallaher v. City of Huntington*, 759 F.2d 1155, 1160 (4th Cir. 1985) (same). In criminal cases, then, "if a law clearly prohibits a defendant's conduct, the defendant cannot challenge, and a court cannot examine, whether the law may be vague for other hypothetical defendants." *Hosford*, 843 F.3d at 170.

Hasson counters that this longstanding rule is no longer the law. According to Hasson, in *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), the Supreme Court repudiated this principle, and those decisions so "clearly undermined" our Court's precedents that they no longer bind this panel, *United States v. Battle*, 927 F.3d 160, 166 n.7 (4th Cir. 2019) (internal quotation marks omitted).[2]

To resolve this issue, it is helpful to review *Johnson* and *Dimaya*. *Johnson* involved a vagueness challenge to the Armed Career Criminal Act of 1984 (ACCA). *See* 576 U.S. at 593. ACCA mandates a 15-year minimum sentence for a defendant convicted of a firearms offense who has three or more prior convictions for either a "serious drug offense" or a "violent felony." 18 U.S.C. § 924(e)(1). In part, the statute defines "violent felony" as a crime punishable by a year or more in prison that "is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another*." *Id.* § 924(e)(2)(B)(ii) (emphasis added). Courts apply

---

[2] Although our Court has applied the rule forbidding a defendant from challenging a statute as vague if it clearly prohibits his own conduct in the years since *Johnson* and *Dimaya*, the Court has never considered whether those decisions undermined that rule. *See, e.g., Fusaro v. Howard*, 19 F.4th 357, 374 (4th Cir. 2021); *Moriello*, 980 F.3d at 931; *Hosford*, 843 F.3d at 170. It is therefore appropriate for us to do so now. *See Mays v. Sprinkle*, 992 F.3d 295, 302 n.4 (4th Cir. 2021); *United States v. Dodge*, 963 F.3d 379, 383–384 (4th Cir. 2020).

11

the categorical approach to determine whether a crime qualifies as a violent felony, including under the italicized "residual clause." *Johnson*, 576 U.S. at 596. Doing so requires assessing the predicate crime "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Id.* (internal quotation marks omitted).

Two aspects of this "wide-ranging inquiry" led the Supreme Court to hold the residual clause unconstitutionally vague. *Id.* at 597. First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime" because "[i]t ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real world facts or statutory elements." *Id.* Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony," for "[i]t is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." *Id.* at 598. Nine years of the Court's fruitless efforts to "craft a principled and objective standard out of the residual clause confirm[ed] its hopeless indeterminacy." *Id.* "Each of the uncertainties in the residual clause may be tolerable in isolation," the Court reasoned, but "their sum makes a task for us which at best could be only guesswork." *Id.* at 602 (internal quotation marks omitted).

In reaching its conclusion, the Court found unpersuasive the contention that "a statute is void for vagueness only if it is vague in all its applications." *Id.* at 603 (internal quotation marks omitted). The Court explained that "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory

12

that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 602.

In *Dimaya*, the Court relied on *Johnson* to hold a residual clause in a different statute unconstitutionally vague. 138 S. Ct. at 1223. Justice Thomas authored an extensive dissent. Among other grounds for his dissent, Justice Thomas adhered to his view, also expressed in *Johnson*, that "a law is not facially vague . . . if there is an unmistakable core that a reasonable person would know is forbidden by the law." *Id.* at 1252 (Thomas, J., dissenting) (internal quotation marks omitted); *see Johnson*, 576 U.S. at 623 (Thomas, J., concurring in the judgment). He also dissented on the separate ground that the statute was not vague as applied to the respondent. *See Dimaya*, 138 S. Ct. at 1250 (Thomas, J., dissenting). As Justice Thomas explained, the Supreme Court's precedents "recognize that, outside the First Amendment context, a challenger must prove that the statute is vague as applied to him" and "*Johnson* did not overrule these precedents." *Id.* at 1250; *see id.* (explaining that the *Johnson* Court concluded ACCA's residual clause was unconstitutional as applied to the crime at issue there). "While *Johnson* weakened the principle that a facial challenge requires a statute to be vague 'in *all* applications,'" he reasoned, "it did not address whether a statute must be vague as applied to the person challenging it." *Id.* (quoting *Johnson*, 576 U.S. at 603).

In a footnote, the *Dimaya* majority responded that *Johnson* "anticipated and rejected a significant aspect of Justice Thomas's dissent," namely his assertion that "a court may not invalidate a statute for vagueness if it is clear in any of its applications." *Id.* at 1214 n.3. *Johnson* did so, the majority explained, by "ma[king] clear that our decisions 'squarely

13

contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" *Id.* (quoting *Johnson*, 576 U.S. at 602). Put another way, the Court reiterated that a statute need not be vague in all its applications to be unconstitutional. But the Court did not address the precedents Justice Thomas cited to demonstrate that "a challenger must prove that the statute is vague as applied to him," *id.* at 1250 (Thomas, J., dissenting), much less the principle that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness," *Parker*, 417 U.S. at 756.

Hasson claims that the rule prohibiting vagueness challenges by those whose conduct a statute clearly prohibits perished alongside the rule requiring a statute to be vague in all its applications. To Hasson, the latter provides the theoretical underpinning for the former. *Johnson* having jettisoned that underpinning, Hasson argues, "a defendant may raise a facial vagueness challenge without regard to whether the statute is vague as applied to him." Opening Br. 20.

We disagree. First, Hasson is wrong about the rationale for the rule prohibiting vagueness challenges by those whose conduct a statute clearly prohibits. The rule shares its foundation with the vagueness doctrine itself, which is based on the concept "'that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" *Parker*, 417 U.S. at 757 (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32–33 (1954)); *see Hoffman Ests.*, 455 U.S. at 495 n.7. Put simply, the vagueness doctrine requires that a criminal statute "provide a person of ordinary intelligence fair notice of what is prohibited" and not be "so standardless

14

that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). When the challenged statute clearly proscribes a defendant's conduct, neither of these rationales is implicated. It would untether the vagueness doctrine from its moorings to permit a facial vagueness challenge in such a case.

Another foundational pillar for the rule prohibiting vagueness challenges by those whose conduct a statute clearly prohibits is the limited nature of judicial power:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously. These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court[.]

*Broadrick v. Oklahoma*, 413 U.S. 601, 610–611 (1973) (citations omitted); *see United States v. Raines*, 362 U.S. 17, 21 (1960) ("Kindred to the[] rules [limiting federal courts to deciding only the cases and controversies properly before them] is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional."); *Kashem v. Barr*, 941 F.3d 358, 375–376 (9th Cir. 2019) (quoting *Broadrick*); *see also United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011). Respect for our circumscribed role is one reason "as-applied challenges are the basic building blocks of constitutional adjudication." *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) (brackets and internal quotation marks omitted).

15

These foundations are independent of the substantive standard for judging a facial vagueness challenge. *See Kashem*, 941 F.3d at 375. That standard—which formerly required a law to be vague in all its applications—speaks to the degree of vagueness a law must exhibit to be found facially unconstitutional. *See Hoffman Ests.*, 455 U.S. at 494–495; *cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act . . . [requires] the challenger [to] establish that no set of circumstances exists under which the Act would be valid."). Consequently, *Johnson* and *Dimaya*'s rejection of the vague-in-all-its-applications standard does not undermine the rule prohibiting defendants whose conduct a statute clearly proscribes from bringing vagueness challenges.

Further, *Johnson* and *Dimaya* did not purport to jettison the latter rule, and it is "the Supreme Court's 'prerogative alone to overrule one of its precedents.'" *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)). Neither *Johnson* nor *Dimaya* "explicitly question[ed] the rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." *Kashem*, 941 F.3d at 376. Indeed, any suggestion that *Johnson* discarded that rule is foreclosed by *Expression Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017), in which, the term after *Johnson*, the Court applied the rule to deny a vagueness claim. *See Expression Hair Design*, 137 S. Ct. at 1151–1152 (holding that the plaintiffs could not raise a successful vagueness claim because the challenged law clearly proscribed their intended speech). We find the Court's application of the rule after *Johnson*—in the speech context no less, where "a heightened vagueness standard applies," *Humanitarian L. Project*, 561

16

U.S. at 20—dispositive that the *Johnson* Court did not silently overrule its precedents prohibiting vagueness challenges by those whose conduct a statute clearly prohibits.

Consistent with that finding, whatever "*Johnson* . . . anticipated and rejected," *Dimaya*, 138 S. Ct. at 1214 n.3, it was not the rule foreclosing a litigant whose conduct is clearly prohibited by a statute from bringing a vagueness challenge. Consequently, we cannot read footnote three of *Dimaya*, which relied on *Johnson*, as quietly abandoning that rule. Indeed, no court of appeals to consider the question has concluded that *Johnson* or *Dimaya* worked such a change. *See United States v. Requena*, 980 F.3d 30, 40–43 (2d Cir. 2020); *United States v. Westbrooks*, 858 F.3d 317, 325 (5th Cir. 2017), *cert. granted & judgment vacated on other grounds*, 138 S. Ct. 1323 (2018); *United States v. Cook*, 970 F.3d 866, 877–878 (7th Cir. 2020); *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016); *Kashem*, 941 F.3d at 376 (9th Cir.); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1190 (10th Cir. 2021).

Even if we were to view *Johnson* and *Dimaya* as instances in which the Court bypassed as-applied challenges to proceed directly to facial vagueness, *but see Johnson*, 576 U.S. at 600 (finding that "the residual clause yields no answers" to the many questions incident to determining whether unlawful possession of a short-barreled shotgun is a violent felony); *Dimaya*, 138 S. Ct. at 1214–1215 & n.3 (finding that burglary is not an "easy application[] of the residual clause" because countless questions attend the "ordinary case" inquiry required by the categorical approach), their unique context sets them apart. *See Requena*, 980 F.3d at 41–43; *Cook*, 970 F.3d at 876–877; *Kashem*, 941 F.3d at 376–377; *cf. Crooks v. Mabus*, 845 F.3d 412, 417 (D.C. Cir. 2016). Indeed, the Court was at

17

pains to emphasize the peculiar double-indeterminacy posed by applying the residual clauses' imprecise qualitative standards to the "judicially imagined 'ordinary case' of a crime" required by the categorical approach. *Johnson*, 576 U.S. at 597–598; *see Dimaya*, 138 S. Ct. at 1215–1216. In a routine vagueness challenge, by contrast, a court is called upon to apply a statutory prohibition to a defendant's real-world conduct. *See United States v. Davis*, 139 S. Ct. 2319, 2327 (2019) ("[A] case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya*."). That inquiry is fully compatible with a traditional as-applied vagueness analysis.

For these reasons, we conclude that *Johnson* and *Dimaya* "did not alter the general rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." *Cook*, 970 F.3d at 877. It follows that neither decision clearly undermined our precedents espousing that rule. And any exceptions must originate from the Supreme Court, whose longstanding precedents supply the rule's foundation. Because Hasson does not contest that Section 922(g)(3) clearly applies to his conduct, his attempt to assert a facial vagueness challenge fails.

## III.

Hasson also appeals his sentence—specifically, application of the terrorism adjustment, which more than tripled his Guidelines range.[3] Hasson mounts two challenges. First, he believes that U.S.S.G. § 3A1.4 is ultra vires to the extent it encompasses defendants not convicted of a federal crime of terrorism. Second, he contends that the

---

[3] The increase would have been greater, but the district court departed downward to criminal history category I.

district court summarily disregarded his expert's findings and opinion that Hasson did not present a risk of violence and so the adjustment should not apply to him. We disagree with both contentions and therefore affirm Hasson's sentence.

A.

Section 3A1.4 applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. The district court rejected Hasson's argument that the adjustment requires a completed terrorism offense. In a separate case, we subsequently agreed, holding that the adjustment does not "require that a defendant be convicted of a federal crime of terrorism" but instead "applies whenever a defendant's offense of conviction or relevant conduct was 'intended to promote' a federal crime of terrorism." *United States v. Kobito*, 994 F.3d 696, 701–702 (4th Cir. 2021). On appeal, Hasson switches gears and argues that, because Section 3A1.4 applies to defendants who were not convicted of a federal crime of terrorism, it contravenes a 1996 congressional directive to the United States Sentencing Commission and is therefore invalid. *See United States v. LaBonte*, 520 U.S. 751, 757 (1997) (holding that if a Guidelines provision "is at odds with [a statutory directive's] plain language, it must give way"). We review legal conclusions de novo but unpreserved arguments only for plain error. *Kobito*, 994 F.3d at 701. Hasson concedes that he did not raise the question of Section 3A1.4's validity below yet disputes that plain error is the correct standard of review.[4] Because the district court

---

[4] We reject the Government's contention that Hasson invited any error. "The invited error doctrine recognizes that a court cannot be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request." *United States*

19

did not err in applying the terrorism adjustment, we conclude that Hasson's argument fails regardless of the standard of review we apply.

Grasping Hasson's argument requires understanding Section 3A1.4's history. Before 1995, the Sentencing Guidelines permitted a "Terrorism" upward departure where "the defendant committed the offense in furtherance of a terroristic action." U.S.S.G. § 5K2.15 (1994). In the Violent Crime Control and Law Enforcement Act of 1994, Congress directed the Sentencing Commission "to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime." Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022 (1994). The Sentencing Commission responded by replacing the upward-departure provision with a new "International Terrorism" adjustment at Section 3A1.4. U.S.S.G. app. C, amend. 526. Section 3A1.4 took effect on November 1, 1995. The inaugural version read:

> **§ 3A1.4.** **<u>International Terrorism</u>**
>
>     (a)    If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
>     (b)    In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

---

*v. Sanya*, 774 F.3d 812, 817 n.2 (4th Cir. 2014) (internal quotation marks omitted). Hasson did not ask the district court to apply the terrorism adjustment, therefore the doctrine is inapplicable.

20

U.S.S.G. § 3A1.4 (1995). The Commentary defined "international terrorism" with reference to that term's definition in 18 U.S.C. § 2331. *Id.* cmt. n.1.

Less than two years later, in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Congress instructed the Sentencing Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code." Pub. L. 104-132, § 730, 110 Stat. 1214, 1303. In response, the Sentencing Commission retitled Section 3A1.4 simply "Terrorism" and replaced the reference to "international terrorism" with "a federal crime of terrorism," as reflected below:

> **§ 3A1.4.** ~~**International**~~ **Terrorism**
>
> (a)    If the offense is a felony that involved, or was intended to promote, ~~international terrorism~~ <u>a federal crime of terrorism</u>, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b)    In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

*Compare* U.S.S.G. § 3A1.4 (1996) *with* U.S.S.G. § 3A1.4 (1995); *see also* U.S.S.G. app. C, amend. 539 (1997). The Commentary defined "federal crime of terrorism" with reference to that term's definition in 18 U.S.C. § 2332b(g). U.S.S.G. § 3A1.4 cmt. n.1 (1996). For purposes of this case, Section 3A1.4 has remained materially unaltered ever since. *See* U.S.S.G. § 3A1.4 (2021).

Hasson contends that the Sentencing Commission misread Congress's 1996 directive. According to Hasson, Congress intended to restrict Section 3A1.4 to cases where

21

the defendant is *convicted* of an offense listed in 18 U.S.C. § 2332b(g)(5), which defines "federal crime of terrorism." Under Hasson's reading of the directive, the Commission should have amended the adjustment as follows:

> **§ 3A1.4.** ~~International~~ **Terrorism**
>
> (a) If the offense is ~~a felony that involved, or was intended to promote, international terrorism~~ <u>a federal crime of terrorism</u>, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Hasson argues that the directive's use of the word "only" compels his interpretation. § 730, 110 Stat. at 1303. In his view, "only" shows Congress intended to narrow the adjustment in some way. But in the same directive, Congress expanded the scope of the adjustment to include cases involving solely domestic terrorism. Hasson argues that limiting the adjustment's application to *convictions* for federal crimes of terrorism is the sole way to effectuate the narrowing quality of the word "only," given the expansion that results from replacing "international terrorism" with "federal crime of terrorism."

We disagree. "As in all statutory construction cases, we assume that the ordinary meaning of the statutory language accurately expresses the legislative purpose." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 376 (2013) (brackets and internal quotation marks omitted). Admittedly, the 1996 directive is ambiguous. But "[r]ecognizing that the Commission 'brings expertise to the implementation of its mandate'" to formulate sentencing guidelines, "we must defer to the Commission's interpretation of a

22

congressional directive as long as that interpretation is not 'at odds with the plain language' of the directive." *United States v. Murphy*, 254 F.3d 511, 512 (4th Cir. 2001) (brackets omitted) (quoting *United States v. Kennedy*, 32 F.3d 876, 889 (4th Cir. 1994), and *LaBonte*, 520 U.S. at 757).

Our review convinces us that the 1996 directive readily supports Section 3A1.4. Congress directed the Sentencing Commission to amend Section 3A1.4—which then applied "[i]f the offense is a felony that involved, or was intended to promote, international terrorism"—so that it "only applies to Federal crimes of terrorism, as defined in [18 U.S.C. §] 2332b(g)." § 730, 110 Stat. at 1303. That direction is reasonably read as instructing the Commission to edit the type of terrorism to which the adjustment applies by replacing "international terrorism" with "federal crimes of terrorism," which the Commission did. The word "only" clarified that Congress intended for "federal crimes of terrorism" to supplant "international terrorism," rather than supplement it such that the adjustment covered both "international terrorism" and "federal crimes of terrorism." Had Congress omitted "only," the Commission may well have preserved the adjustment's application to "international terrorism." Congress obviated that ambiguity by including "only" in its instructions.

Context further supports the Commission's interpretation. Less than two years before the 1996 directive, Congress instructed the Commission to apply Section 3A1.4 to "any felony . . . that involves *or* is intended to promote international terrorism," and the Commission did so. § 120004, 108 Stat. at 2022 (emphasis added). As we have explained, that disjunctive phrase creates two ways in which the adjustment can be triggered: (1) by

23

an offense that "involves" terrorism, or (2) by an offense "intended to promote" terrorism. *See Kobito*, 994 F.3d at 702. The 1996 directive did not purport to reduce these two options to one; indeed, it said nothing about the offenses to which the adjustment applies or their relationship to the crime of terrorism. If Congress had intended to completely rewrite the precise language it had dictated less than two years prior, we expect it would have done so more clearly. Instead, Congress's 1996 directive focused on the nature of the terrorism involved, which is but one facet of Section 3A1.4, and the Commission changed that aspect of the adjustment in response.

Attempting to overcome the Commission's reasonable interpretation, Hasson argues that legislative history supports his reading. He quotes AEDPA's Conference Report, which says that "[t]his section of the bill will make that new provision applicable only to those specifically listed federal crimes of terrorism, *upon conviction of those crimes* with the necessary motivational element to be established at the sentencing phase of the prosecution." H.R. Rep. No. 104-518, at 123 (1996) (emphasis added). In Hasson's view, the emphasized portion confirms that Congress intended for Section 3A1.4 to apply only upon a defendant's conviction for an enumerated offense.

But "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018). Only the statute itself underwent the constitutionally required process of bicameralism and presentment. Therefore "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005); *see also City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 337 (1994) ("But it is the statute, and not the Committee Report, which is the

24

authoritative expression of the law[.]"). And the statute here supports the Commission's interpretation.

Moreover, even if we were to consider it, the Conference Report does not compel the meaning Hasson attaches to it. Although one could read Hasson's selected quotation as requiring a conviction for a federal crime of terrorism, one could also read it as stating a sufficient, but not necessary, condition for applying the adjustment. *Cf. United States v. Tankersley*, 537 F.3d 1100, 1113 (9th Cir. 2008) ("Based on this legislative history, we conclude that through the terrorism enhancement Congress wanted to impose a harsher punishment on any individual who committed an offense that involved or intended to promote one of the enumerated terrorist acts, and intended, through that offense, to influence the conduct of others."). The ambiguous Conference Report provides Hasson no refuge.

In sum, applying Section 3A1.4 absent a conviction for a federal crime of terrorism does not impermissibly contravene Congress's directive. That being so, Hasson has failed to demonstrate that the district court erred—plainly or otherwise—in applying the adjustment as written by the Commission.

B.

In the alternative, Hasson contends that the district court disregarded the findings and opinions of his "violence risk assessment" expert and therefore erroneously concluded that Hasson's conduct satisfied Section 3A1.4. Finding no clear error, we affirm.

25

## 1.

To apply the terrorism adjustment, the district court was required to find that at least one of Hasson's offenses "involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). A "federal crime of terrorism" is an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), and that violates one of the statutes listed in 18 U.S.C. § 2332b(g)(5)(B). *See Kobito*, 994 F.3d at 700; *United States v. Hassan*, 742 F.3d 104, 148 (4th Cir. 2014). An offense is "intended to promote" a federal crime of terrorism "whenever the defendant commits a felony with a goal or purpose to bring or help bring into being a crime listed in 18 U.S.C. § 2332b(g)(5)(B), even if the defendant has not necessarily completed, attempted, or conspired to commit the crime." *Kobito*, 994 F.3d at 702 (citations, ellipsis, and internal quotation marks omitted). "[A] court deciding whether to impose the terrorism enhancement must resolve any factual disputes that it deems relevant to application of the enhancement, and then, if it finds the requisite intent, should identify the evidence in the record that supports its determination." *Hassan*, 742 F.3d at 148 (internal quotation marks omitted); *see also United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008). The Government must prove by a preponderance of the evidence that the adjustment applies. *Kobito*, 994 F.3d at 701.

The district court concluded that Hasson's firearms offenses were designed to promote 18 U.S.C. § 351, which, in relevant part, criminalizes "attempts to kill or kidnap" any member of Congress, any Supreme Court Justice, and certain executive officials. 18

U.S.C. § 351(a), (c). The court also found that Hasson committed his crimes "for the purpose of coercing the Government and retaliating against them." S.J.A. 955. The court meticulously detailed the facts underlying its conclusion, noting they were "just a thumbnail of the voluminous materials that the Government has submitted." S.J.A. 951. We rehearse the court's findings briefly here.

The court first cited Hasson's writings identifying himself as "a white nationalist for over 30 years" and advocating "a little focussed [sic] violence" to "make change." S.J.A. 951–952. It noted his 2017 draft email indicating "that he had to take a serious look at appropriate individual targets to bring greatest impact. Professors, DR's, politicians, judges, leftists in general." S.J.A. 952. The court then recounted Hasson's endeavor to become proficient in long-range precision marksmanship: He registered for an online sniper and sharpshooter forum; purchased the Bergara rifle, which he outfitted with high-end scopes; searched for and began his own sniper logbook; researched distance shooting; and obtained a ballistics calculator spreadsheet. The court described Hasson's efforts to learn where he could locate prominent political figures. He "searched for where do most senators live in D.C., do senators have SS protection, and are Supreme Court justices protected." S.J.A. 953 (internal quotation mark omitted). He searched "Maxine Waters[,] D.C."; "how do senators get around D.C."; "how do senators and congressmen get around D.C. private subway"; "best place in D.C. to see congress people"; and "where in D.C. do Congress [sic] live." S.J.A. 953–954. He also searched for where Justices Sotomayor and Kagan live. Those inquiries corresponded to Hasson's searches within the Breivik manifesto for "category A, which refers to a category of traitors who are most influential

27

and includes political leaders." S.J.A. 953. "[J]ust two weeks after reviewing the Breivik manifesto," Hasson "compiled a list that included prominent congressional leaders, among other potential targets." S.J.A. 954.

The court also recounted the evidence seized during the search of Hasson's residence. Authorities recovered testosterone, anabolic steroids, and human growth hormone, which corresponded to his query for "steroids" in the Breivik manifesto, where Breivik "suggest[ed] that an assailant begin a steroid cycle once the preparation phase for an attack begins." S.J.A. 953–954. The search also "revealed an enormous array of weapons and ammunition consistent with someone planning to carry out just the sort of attacks that are described." S.J.A. 954.

In the end, "[a]ll of these actions taken together convince[d] the [c]ourt . . . well beyond the preponderance standard[] that [Hasson] was, in fact, intending to promote a federal crime of terrorism." S.J.A. 954. And his "choice of targeting politicians indicate[d] that he was, in fact, doing this or planning to do this . . . for the purpose of coercing the Government and retaliating against them." S.J.A. 955. The court reasoned that Hasson's rhetoric and weaponry viewed separately would not justify applying the terrorism adjustment, but in combination they revealed "that he was actually in the process of formulating a plan that makes this a case where the terrorism enhancement [applies]." S.J.A. 954–955.

## 2.

We review the factual findings underlying the district court's application of the terrorism adjustment for clear error. *Kobito*, 994 F.3d at 701. In so doing, we "'ask

28

whether, on the entire evidence,'" we are "'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). Such a conviction may "be based upon a conclusion that, without regard to what the actual facts may be, the findings under review . . . were made without properly taking into account substantial evidence to the contrary," *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 (4th Cir. 1983) (internal quotation marks omitted), such as when a district court fails to "acknowledge," "account for," or "consider" substantial contradictory evidence, *Wooden*, 693 F.3d at 453–454.

Hasson urges us to find clear error in the district court's treatment of his expert's opinions and testimony. In anticipation of sentencing, Hasson commissioned a "violence risk assessment" from Stephen D. Hart, Ph.D., whose experience includes consulting with law-enforcement agencies "regarding risk for serious violence, including terrorism, mass casualty violence, and targeted violence." J.A. 782. After interviewing Hasson and reviewing evidence in the case, Dr. Hart prepared a report in which he opined that the evidence "does not support the government's theory that Mr. Hasson intends (or intended) to commit acts dangerous to human life," "that he is (or was) a domestic terrorist," or that he "pose[s] a risk of serious violence." J.A. 785. Dr. Hart also testified at Hasson's sentencing hearing, where the Government cross-examined him. Hasson claims that the district court summarily dismissed Dr. Hart's opinions, did not acknowledge several of his key conclusions, and did not account for or explain why it disagreed with aspects of his testimony.

29

We discern no clear error in the district court's consideration of Dr. Hart's opinions. The court directly addressed Dr. Hart's conclusions and explained why it gave them little credit. For example, the court noted that cross-examination revealed "serious questions" about Dr. Hart's methodology. S.J.A. 955. The court further identified particular evidence that it believed contradicted Dr. Hart's findings.[5] This is wholly unlike the cases on which Hasson relies, where courts entirely failed to consider or address substantial evidence.

Nor does the absence of contrary expert testimony undermine the district court's findings. "[T]he trier of facts is not required to accept uncontradicted testimony," where, as here, it finds that the evidence in the record undermines or discredits that testimony. *Am. Mfg. Assocs., Inc. v. N.L.R.B.*, 594 F.2d 30, 34 (4th Cir. 1979). The district court weighed Dr. Hart's opinion testimony against a truly voluminous record of documentary evidence and found the conclusions Dr. Hart drew from that record unpersuasive. That was its prerogative as the finder of fact and was not clear error.

## IV.

Because Hasson does not contest that 18 U.S.C. § 922(g)(3) clearly prohibited his conduct, he cannot challenge the statute as unconstitutionally vague. Nor has he demonstrated that the district court legally or factually erred in applying U.S.S.G. § 3A1.4's terrorism adjustment to increase his Guidelines sentencing range. We accordingly affirm both the denial of Hasson's motion to dismiss the Section 922(g)(3) charge and the resulting sentence.

---

[5] The district court did, however, "give some of Dr. Hart's comments consideration under [18 U.S.C. §] 3553." S.J.A. 956.

*AFFIRMED*