FILED
United States Court of Appeals
Tenth Circuit

February 9, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

JONATHAN ALEXANDER MORALES-LOPEZ,

    Defendant - Appellee.

No. 22-4074

———————————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:20-CR-00027-JNP-1)**

———————————————————

Nathan Jack, Assistant United States Attorney (Trina A. Higgins, United States Attorney, and Jennifer P. Williams, Assistant United States Attorney, on the briefs), Salt Lake City, Utah, for Plaintiff-Appellant.

Scott Keith Wilson, Federal Public Defender (Jessica Stengel and Bretta Pirie, Assistant Federal Public Defenders, with him on the brief), Salt Lake City, Utah, for Defendant-Appellee.

———————————————————

Before **CARSON**, **BALDOCK**, and **EBEL**, Circuit Judges.

———————————————————

**BALDOCK**, Circuit Judge.

———————————————————

Federal law prohibits certain people from possessing firearms.  18 U.S.C. § 922(g).  The portion of § 922(g) at issue in this appeal is subsection (g)(3), which

in relevant part forbids any person "who is an unlawful user of . . . any controlled substance" from possessing a firearm. A jury convicted Defendant Jonathan Morales of violating § 922(g)(3). But post-trial, the district court granted Defendant's motion to dismiss the charge as violative of the Fifth Amendment's Due Process Clause. U.S. Const. amend. V. According to the district court, subsection (g)(3)'s phrase "unlawful user" was unconstitutionally vague both on its face and as applied to the facts underlying Defendant's conviction. *United States v. Morales-Lopez*, 2022 WL 2355920 (D. Utah 2022) (unpublished). The Government appeals. Exercising jurisdiction pursuant to 18 U.S.C. § 3731, we first hold, based on binding precedent, that the district court erred in *considering* whether § 922(g)(3) was unconstitutional on its face. We further hold, again based on binding precedent, that the district court erred in *determining* § 922(g)(3) was unconstitutional as applied to Defendant's criminal conduct. Accordingly, we reverse and remand with instructions to reinstate the jury's verdict.[1]

I.

Let us begin with the facts established at trial. Defendant Morales and Jose Amaya were partners in crime. On January 10, 2020, the two men were stealing firearms and ammunition from the Sportsman's Warehouse in Midvale, Utah during morning business hours. Amaya served as point man and Defendant as lookout. Store employees

---

[1] In *United States v. Wilson*, 420 U.S. 332, 344–45 (1975), the Supreme Court explained: "[W]here appellate review would not subject the defendant to a second trial, this Court has held that an order favoring the defendant could constitutionally be appealed by the Government. . . . Since reversal on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecution." In other words, "where there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended." *Id.* at 344.

observed the two men on security video and phoned police.  While Amaya gathered the ware, Defendant moved to the front of the store.  Defendant exited the store and walked west, away from the parking lot.  Amaya's Nissan Altima, in which the two suspects had arrived, was parked across the street in a handicap space directly in front of the store.

Meanwhile, a number of officers responded to the call of a robbery in progress. Dispatch informed officers that Defendant was leaving the store.  Sergeant Chacon and Officer Wathen arrived on scene about the same time.  Sergeant Chacon "observed a Hispanic male dressed in a black jacket, jeans, and a black hat which fit the description given."  The two officers ordered Defendant to the ground and he complied.  During a *Terry* frisk, Officer Wathen recovered a loaded semiautomatic .40 caliber Smith & Wesson Shield handgun from Defendant's waistband.[2]  Investigation revealed Amaya had stolen the firearm found on Defendant from the same Sportsman's Warehouse five days earlier on January 5.  Officer Wathen handcuffed Defendant and placed him in the backseat of his patrol car.

About the same time, Officer Jonkman arrived on the scene and parked his vehicle directly behind Amaya's Nissan to "block it in."  While providing "over-watch security," Jonkman witnessed Defendant acting suspiciously.  Officer Jonkman testified:

> So I went back over by Officer Wathen's patrol car.  And shortly later I noticed [Defendant] in the back of the patrol car making some extreme movements.  To me it kind of worried me, believing that maybe . . . somebody missed a weapon or something on him.  But it looked like he was trying to maneuver something.

---

[2]  During this time, other responding officers were inside the Sportsman's Warehouse arresting Amaya and dispossessing him of stolen firearms and ammunition.

So I actually moved myself to the front of the patrol car and spoke to other officers and said, hey, something's going on in there. And it was determined that . . . [Defendant] was going to be taken out of the car and another search be done. . . .

After he was taken out of the car, I noticed in between the back cushion of the seat and the bottom cushion a plastic bag sticking out about two inches, sticking out from in between the seats.

Between the cushions behind where Defendant had been sitting, Officer Jonkman recovered a plastic baggy containing about 5.7 grams of methamphetamine. Detective Davis testified that in his opinion, in the absence of other evidence or factors indicating an intent to distribute, the 5.7 grams was intended for personal use. Officer Wathen additionally testified that his standard practice was to inspect and clean the backseat of his patrol car after an individual had occupied and vacated the seat. Wathen confirmed no one other than Defendant had been in the backseat of his patrol car that day.

After securing Defendant and Amaya, officers turned their attention to Amaya's Nissan Altima. Officer Bartholomew testified he saw what looked to be a glass pipe used for smoking drugs in the vehicle's center console. Once officers impounded the vehicle and obtained a search warrant, they recovered the glass pipe which contained methamphetamine residue. Officers also recovered a butane lighter and baggy containing about 22.7 grams of methamphetamine from the driver's door panel. This amount of methamphetamine, according to Detective Davis, "without other factors or indicators," was "consistent with distribution."

Two months later, while Defendant was in custody awaiting trial, Officer Atkin interviewed him regarding a separate investigation apparently involving a drug

4

house and a drug dealer named Jesus. During this conversation, Defendant admitted to using drugs regularly in early December 2019, about a month prior to his arrest at the Sportsman's Warehouse. Defendant confirmed that he went to a house to use methamphetamine on the day in question, but his memory was unclear because he had been using and had not slept for a number of days. Defendant did not know who owned the house. Defendant mentioned he was purchasing user amounts of methamphetamine from Jesus around the same time. Defendant told Officer Atkin "yes, I have been—was buying from him." Defendant continued: "I would see [Jesus] on the street . . . there were always people that I knew that would see me . . . , and they would ask me, 'Hey, you want some?' I would say, 'Yes.'" Defendant also told Officer Atkin that he had smoked marijuana, still illegal in Utah, with Amaya at the latter's invitation around December 6.

## II.

At trial, the district court instructed the jury that an "unlawful user" of a controlled substance as the language appears in § 922(g)(3) is an individual who "had been using a controlled substance on a regular and ongoing basis at the time he was found to be in possession of a firearm." After the jury returned a verdict of guilty based on the foregoing evidence, the district court granted Defendant's motion to dismiss the § 922(g)(3) count because, in the court's view, subsection (g)(3) was unconstitutionally vague both on its face and as applied. Because the district court granted Defendant's motion to dismiss as a matter of law upon an uncontested trial record, we review both its

5

constitutional rulings de novo. *United States v. Wenger*, 427 F.3d 840, 851 (10th Cir. 2005); s*ee also United States v. Copeland*, 921 F.3d 1233, 1241 (10th Cir. 2019).

## A.

Addressing Defendant's facial challenge first, we observe that for over a century federal courts have adjudicated challenges to the constitutionality of penal statutes by relying on the general rule that a defendant to whose conduct a statute clearly applies may not pose a facial challenge to the statute. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (citing cases). In other words, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). Even where a statute threatens to chill the fundamental right to speech, a "plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim" to the face of the statute. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017) (quoting *Holder*, 561 U.S. at 20).

All this makes perfectly good sense. The "first essential of due process of law" is grounded in the principle that where a person of ordinary intelligence may reasonably understand that the law proscribes his *own* conduct, criminal responsibility justifiably may follow. *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). "Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Parker v. Levy*, 417 U.S. 733, 757 (1974) (quoting *United States v. Harriss.*, 347 U.S. 612, 617 (1954)).

After all, why should one to whom application of a statute is plainly constitutional be allowed to attack the law for the reason that it might be unconstitutionally vague when applied to hypothetical facts not before the court?

Where the text of a statute applies to a violator's conduct, either by its plain language or "settled interpretations," these "violators certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment. They are not punished for violating an unknowable something." *United States v. Lanier*, 520 U.S. 259, 267 (1997) (internal brackets, ellipses, and quotation marks omitted). As the Supreme Court has explained: "*Embedded in the traditional rules governing constitutional adjudication* is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick*, 413 U.S. at 610 (emphasis added). We have long heeded this admonition.

Consider *United States v. Reed*, 114 F.3d 1067 (10th Cir. 1997), where we addressed the *very same* facial challenge to § 922(g)(3) that confronts us today. We applied this traditional rule of constitutional adjudication to conclude that a vagueness challenge to § 922(g)(3) "cannot be aimed at the statute on its face but must be limited to the application of the statute to the particular conduct charged." *Id.* at 1070. We explained the traditional rule applied "except in those *rare* instances where a legislature has enacted a statute which is so totally vague as to 'proscribe[] no comprehensible course of conduct at all.'" *Id.* at 1070 n.1 (emphasis added) (quoting *United States v.*

*Powell*, 423 U.S. 87, 92 (1975)).  But, we reasoned, § 922(g)(3) was not such a statute because it was "susceptible of a construction which would avoid the vagueness problem." *Id.* at 1071.

Although our decisions in this area have not wavered from these principles of construction, the district court had a different perspective.  In *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B), specifically its definition of a "violent felony," was unconstitutionally vague for the purpose of sentencing enhancement.  The district court became the first and to date only federal court to read *Johnson* as overturning a significant number of Supreme and Circuit Court precedents and telling us facial challenges to criminal statutes are now readily available to defendants.  *Morales-Lopez*, 2022 WL 2355920, at \*5 (opining that *Johnson* "allows a defendant to bring a facial challenge without regard to the particular facts of his case").  But neither *Johnson* nor its progeny can reasonably be read to support the district court's conclusion.[3] *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (holding a residual clause, 18 U.S.C. § 16(b), defining "crime of violence" unconstitutionally vague); *United States v. Davis*, 139 S. Ct. 2319 (2019) (holding a residual clause, 18 U.S.C. § 924(c)(3)(B), defining "crime of violence" unconstitutionally vague).

---

[3] The Circuit Courts of Appeals to have addressed the question are uniform in their rejection of the district court's view.  At least seven Circuits have stated that *Johnson* did not affect the traditional rule that a facial vagueness challenge cannot be lodged against a statute.  Rather, a vagueness challenge requires application of the statute to the facts of the particular case.  *See United States v. Lewis*, __ F. Supp. 3d __, __, 2023 WL 4604563, at \*3 (S.D. Ala. 2023) (citing decisions from the Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Federal Circuits).

The explanation is straightforward. These Supreme Court cases applied the so-called "categorical approach" to address the constitutionality of residual clauses providing for sentencing enhancements. *See Taylor v. United States*, 495 U.S. 575, 600 (1990). Under the categorical approach, a court assesses whether a crime qualifies for an enhanced sentence "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Johnson*, 576 U.S. at 596 (internal quotation marks omitted). To determine whether the crime with which a defendant was charged was subject to a sentencing enhancement under the residual clauses, courts "had to disregard how the defendant actually committed his crime. Instead, [courts] were required to *imagine* the idealized 'ordinary case' of the defendant's crime and then *guess* whether . . . [the level of risk specified by the residual clause] would attend its commission." *Davis*, 139 S. Ct. at 2326 (emphasis added). These Supreme Court decisions "teach that imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined 'ordinary case.'" *Id.*

Section 922(g)(3) has little in common with the respective residual clauses at issue in *Johnson*, *Dimaya*, and *Davis*. Such clauses are *sui generis*. *Unlike § 922(g)(3), the residual clauses at issue in these Supreme Court decisions, as a matter of statutory construction, did not permit the Court to apply the clauses' proscribed course of conduct to the actual facts of the defendant's case. This is the critical distinction between those cases and the present one.* In a routine vagueness challenge such as presented here, a court applies a statutory prohibition to the defendant's "real-world" conduct. Because the

residual clauses in *Johnson*, *Dimaya*, and *Davis* did not permit the district court to consider the defendants' actual conduct to determine the propriety of a sentencing enhancement, the traditional rule that a defendant to whose actual conduct a statute clearly applies may not successfully challenge it for vagueness is entirely beside the point.  The Supreme Court's observation in *Davis*, 139 S. Ct. at 2327, confirms our conclusion:  "[A] case specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya*.  In those cases, we recognized that there would be no vagueness problem with asking a jury to decide whether a defendant's 'real-world conduct' created [the modicum of risk of physical violence called for by the residual clauses]."

Understandably then, neither *Johnson*, *Dimaya*, nor *Davis* had reason to address, let alone question, the indelible rule that a defendant whose *own* conduct is clearly prohibited by a penal statute cannot pose a facial challenge to the statute.  The district court misread *Johnson* to "allow[] the defendant . . . to mount a facial attack on the residual clause without any showing that it was unconstitutional *as applied to him*." *Morales-Lopez*, 2022 WL 2355920, at \*4 (emphasis added).  The Supreme Court was quite clear, however, that the residual clause as Congress wrote it did not permit the Court to consider the facts underlying the defendant's crime.  *Johnson*, 576 U.S. at 603–04.  And neither did the residual clauses in *Dimaya* or *Davis*.  *Dimaya*, 138 S. Ct. at 1216–18 (plurality); *Davis*, 139 S. Ct. at 2327–29.

In reaching its conclusion, the district court relied on the Supreme Court's statement in *Johnson* that, contrary to language in some of its earlier opinions, a

purportedly vague statute is not necessarily constitutional on its face "merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602. According to the district court, "[b]ecause *Johnson* clarified that a statute can be facially void even if it could be constitutional under some factual scenarios, it stands to reason that defendants are no longer required to show that a statute is unconstitutional as applied to the facts of their cases." *Morales-Lopez*, 2022 WL 2355920, at *4. But we explained in *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1190 (10th Cir. 2021), *rev'd on other grounds*, 143 S. Ct. 2298 (2023), a decision the district court never referenced, that the Court's language in *Johnson* "described the standard for determining whether a statute is, as a matter of law, unconstitutionally vague—not the standard for determining when a party may bring a vagueness challenge."

In other words, the *Johnson* Court's view that a statute need not be unconstitutional in all its applications for the statute to be vague on its face addresses *what* a defendant must show, or perhaps more accurately need not show, to wage a successful facial challenge where available. This bears upon a defendant's burden of proof. This says nothing about *who* may raise a facial challenge.[4] We opined as much in

---

[4] Prior to the district court's decision, the three Circuit Courts to have addressed the matter post *Johnson* effectively rejected the district court's reasoning and upheld the traditional rule of constitutional construction in cases involving facial challenges to § 922(g)(3). *United States v. Hasson*, 26 F.4th 610, 619 (4th Cir. 2022) ("*Johnson*['s] . . . rejection of the vague-in-all-its-applications standard does not undermine the rule prohibiting defendants whose conduct a statute clearly proscribes from bringing vagueness challenges."); *United States v. Cook*, 970 F.3d 866, 877 (7th Cir. 2020) ("*Johnson* did not alter the general rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge."); *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (Per

*Elenis*, where we concluded the district court "correctly relied on *Expressions Hair Design* [137 S. Ct. at 1151–52] . . . , a case decided after *Johnson*, in which the Supreme Court reaffirmed that 'a plaintiff whose speech is proscribed cannot raise a successful vagueness claim.'"[5]  *Elenis*, 6 F.4th at 1190.  If this is true in the First Amendment context, surely it is true in other contexts not calling for application of the "categorical approach."

In sum, the district court erred when it considered Defendant's facial challenge to § 922(g)(3) based upon its view that the Supreme Court in *Johnson* upended the traditional rule that a defendant whose conduct is clearly prohibited by a statute cannot pose a facial challenge to the statute while ignoring his *own* conduct.  The Supreme Court does not lightly overturn its own precedents and certainly not with language that—*if* the district court's reading of *Johnson* were to prevail—could only be described as cryptic.  Any change to a canon that the Supreme Court has "[e]mbedded in the traditional rules of constitutional adjudication," *Broadrick*, 413 U.S. at 610, and whose foundation rests in

---

Curiam) ("Though [after *Johnson* a defendant] need not prove that § 922(g)(3) is vague in all its applications, our case law still requires him to show that the statute is vague as applied to his particular conduct.").  Both the Fourth and Seventh Circuits' decisions, in particular, explain in much detail why today we reach a result consistent with their own.  We do not create circuit splits without "sound reason" to do so and most assuredly no such reason exists in this case.  *United States v. Thomas*, 939 F.3d 1121, 1130–31 (10th Cir. 2019).

[5]  The Supreme Court's decision in *Elenis* did not address this point.  Making the district court's failure to reference our decision in *Elenis* all the more puzzling is the fact that at the time the district court rendered its opinion in the present case, the Supreme Court had not yet rendered its decision in *Elenis*, thus making the entirety of our decision in *Elenis* still good law at that point—and clearly binding on the district court.

years of Supreme Court precedent must come in no uncertain terms from the Supreme Court itself. To tell us when its longstanding precedents, precedents on which inferior federal courts have long relied, are no longer good law is the sole prerogative of the Supreme Court. *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule . . . its precedents.").

## B.

This leaves us with Defendant's as-applied challenge to § 922(g)(3). The district court recognized it need not reach Defendant's as-applied challenge after ruling the statute was unconstitutionally vague on its face. The court continued on, however, explaining that "if forced to review [§ 922(g)(3)] under an as-applied challenge, the court would find the statute is vague as applied to [Defendant's] conduct because the statute does not provide adequately clear notice to an ordinary person that possessing a gun five weeks after using drugs is prohibited conduct." *Morales-Lopez*, 2022 WL 2355920, at *12. According to the district court, the Government presented no evidence at trial that Defendant "actually used drugs at any point in the five weeks leading up to his arrest." *Id.* The entirety of the trial evidence and reasonable inferences to be drawn therefrom, properly considered in view of the governing law, however, tell a different tale.

"When the validity of a[] [statute] is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that [courts] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932). To narrow the meaning of "user" and eliminate the risk that § 922(g)(3) could be vague in its application, federal appeals

13

courts, consistent with our view in *Reed* that the statute was susceptible to a narrowing construction, 114 F.3d at 1071, have interpreted § 922(g)(3) so a defendant may be convicted thereunder only if the Government "introduced sufficient evidence of a temporal nexus between the drug use and firearm possession." *United States v. Edwards*, 540 F.3d 1156, 1163 (10th Cir. 2008); *see also United States v. Carnes*, 22 F.4th 743, 747–49 (8th Cir. 2022); *United States v. Cook*, 970 F.3d 866, 878–80 (7th Cir. 2020). In *United States v. Bennett*, 329 F.3d 769, 778 (10th Cir. 2003), we held that the defendant's "regular and ongoing use of . . . methamphetamine during the same time as his firearm possession qualified him as an 'unlawful user of a controlled substance.'" (internal brackets and ellipses omitted). Defendant does not suggest the district court improperly instructed the jury by telling it that to convict him under § 922(g)(3), it had to find his use of controlled substances "regular and ongoing" at the time he possessed the stolen firearm. So the question becomes just this: Where "use" is defined as "regular and ongoing," whether a person of ordinary intelligence would understand that Defendant's conduct could constitute a violation of § 922(g)(3).

We begin by considering Defendant's post-arrest interview with Officer Atkin. This interview revealed that Defendant, based both on how he described procuring and using methamphetamine, was a serious drug user four or five weeks before he and Amaya attempted to rob the Sportman's Warehouse on January 10. Defendant admitted buying drugs from Jesus as well as other individuals he ran into in the neighborhood in December 2019: "[T]here were *always* people that I knew that would see me . . . , and they would ask me, 'Hey, you want some?' I would say, '*Yes*.'" (emphasis added). The

14

fact that people "always" solicited Defendant to buy drugs and he accepted their solicitations certainly suggest that Defendant's drug use was regular and ongoing in December 2019.  That Defendant did not know the owner of the house where he went to ingest methamphetamine around the relevant time only bolsters our conclusion. Defendant admitted his memory was unclear because he had been using drugs and had not slept for a number of days.

Now let us move forward one month to January 2020 and consider the evidence of Defendant's drug use uncovered on the day of his arrest—evidence the district court apparently overlooked.  Amaya and Defendant drove to the Sportsman's Warehouse in the former's Nissan Altima.  Inside the vehicle, investigators located over 22 grams of methamphetamine and a lighter in the driver's door panel.  In the center console, investigators recovered a pipe with methamphetamine residue.  Make of this evidence in isolation what you will because from this point forward things only get worse for Defendant.  The elephant in the room is the 5.7 grams of methamphetamine uncovered in the backseat of Officer Wathen's patrol car directly behind where Defendant had been sitting after he was placed in custody.  Even the district court recognized that Defendant possessed the methamphetamine before unloading it in the backseat of Officer Wathen's squad car.  *Morales-Lopez*, 2022 WL 2355920, at *12 ("[T]he same day he was arrested at Sportsman's Warehouse, [Defendant] possessed methamphetamine.").  And what was Defendant's reason for possessing the methamphetamine?  Based on his training and experience, Detective Davis testified that the amount of methamphetamine Defendant possessed at the time of his arrest was for personal use.

Considering the foregoing evidence *in its entirety*, Defendant's December 2019 drug use appears to have been still regular and ongoing as of January 10, 2020, when he was arrested. The district court opined that the Government presented no evidence Defendant "actually used drugs at any point in the five weeks leading up to his arrest." *Id.* But the court's apparent insistence on direct evidence is mistaken. We simply cannot ignore the reasonable inferences to be drawn from the circumstantial evidence presented—inferences that could well lead a reasonable person to conclude Defendant's drug use was regular and ongoing at the time he possessed a stolen firearm. Our words in *Edwards*, 540 F.3d at 1162, fit perfectly: "While . . . the Government did not introduce specific, direct evidence pinpointing precise dates on which Defendant used drugs, the evidence introduced at trial supported a reasonable inference that Defendant was a user of controlled substances during all relevant times." *See also Bennett*, 329 F.3d at 776 ("[A] court may use evidence of a defendant's unlawful use of drugs while on bond to infer he was a user at the time he possessed a firearm.").

If Defendant's regular and ongoing use of methamphetamine in December 2019 was no longer regular and ongoing at the time of his arrest, why did he arrive to rob a gun store in a vehicle with a man he had used drugs with just the previous month and that contained not only methamphetamine and a lighter, but, sitting in the center console in plain view, a pipe with methamphetamine residue? And most importantly of all, what was Defendant doing with a user amount of methamphetamine on his person at the time of his arrest? People do not carry methamphetamine on their persons absent an intention

16

to use or distribute, or both.  The uncontested evidence in this case was that the amount Defendant possessed was intended for personal use.

The dispositive point of all this is that § 922(g)(3)'s phrase "unlawful user of . . . any controlled substance" is clear in its application to Defendant's conduct.  The facts presented at trial, coupled with reasonable inferences drawn from those facts, could support the conclusion that Defendant was an "unlawful user" of methamphetamine, one whose use was "regular and ongoing," while in possession of a stolen firearm on January 10.  Because the Government introduced sufficient evidence of the requisite temporal nexus between Defendant's drug use and firearm possession, Defendant's as applied challenge must fail.

* * *

Accordingly, the judgment of the district court dismissing the § 922(g)(3) charge against Defendant as violative of the Fifth Amendment's Due Process Clause is REVERSED.  This matter is REMANDED to the district court with instructions to reinstate the jury's verdict and proceed accordingly.