**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-1439 |
| *Plaintiff - Appellee*, | D.C. No. 1:22-cr-00139-SPW-1 |
| v. | |
| JAREN MICHAEL STENNERSON, | OPINION |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Argued and Submitted September 24, 2024
San Francisco, California

Filed September 9, 2025

Before: Johnnie B. Rawlinson, Danielle J. Forrest, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Forrest

# SUMMARY[*]

## Criminal Law / Second Amendment

The panel affirmed the district court's denial of a motion to dismiss an indictment charging Jaren Michael Stennerson with being an unlawful drug user in possession of a firearm in violation of 18 U.S.C. § 922(g)(3) and illegally receiving a firearm while under felony indictment in violation of 18 U.S.C. § 922(n).

Stennerson argued that §§ 922(g)(3) and 922(n) are facially unconstitutional under the Second Amendment and that § 922(g)(3) is unconstitutionally vague as applied to him. The panel held that §§ 922(g)(3) and 922(n) are facially constitutional under the analysis established in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022), and *United States v. Rahimi*, 602 U.S. 680, 693 (2024), because there are circumstances in which they can be applied that are consistent with our nation's history and tradition of firearms regulation. The panel also held that § 922(g)(3) is not unconstitutionally vague as applied to Stennerson because he was an admitted daily user of methamphetamine when he was charged with unlawful possession of a firearm.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Timothy A. Tatarka (argued) and Julie Patten, Assistant United States Attorneys; Jesse A. Laslovich, United States Attorney; Office of the United States Attorney, United States Department of Justice, Billings, Montana; Suzanne Miles, Office of the United States Attorney, United States Department of Justice, Portland, Oregon; for Plaintiff-Appellee.

Steven C. Babcock (argued) and Gillian E. Gosch, Assistant Federal Public Defenders; Rachel Julagay, Federal Defender; Federal Defenders of Montana, Billings, Montana; for Defendant-Appellant.

---

**OPINION**

FORREST, Circuit Judge:

Jaren Michael Stennerson was indicted for being an unlawful drug user in possession of a firearm in violation of 18 U.S.C. § 922(g)(3) and illegally receiving a firearm while under felony indictment in violation of 18 U.S.C. § 922(n). He argues that these two subsections of § 922 are facially unconstitutional under the Second Amendment and that § 922(g)(3) is unconstitutionally vague as applied to him. The district court denied Stennerson's motion to dismiss his indictment on these grounds, and we affirm. Sections 922(g)(3) and (n) are facially constitutional under the analysis established in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022), and *United States v. Rahimi*, 602 U.S. 680, 693 (2024), because there are circumstances in which they can be applied that are consistent with our

nation's history and tradition of firearms regulation. Additionally, § 922(g)(3) is not unconstitutionally vague as applied to Stennerson because he was an admitted daily user of methamphetamine when he was charged with unlawful possession of a firearm.

## BACKGROUND

Stennerson was arrested in August 2019 in relation to a burglary. Officers found methamphetamine and syringes in his possession. Stennerson stated that he had the syringes because he was addicted to methamphetamine. In addition to burglary, Stennerson was charged in Montana state court with criminal possession of dangerous drugs, which is a felony. His pretrial release conditions prohibited him from possessing firearms.

Two and a half years later, in March 2022, Stennerson's state charges were still pending, and officers detained him and seized a firearm that was previously reported stolen. Following his arrest, he admitted that he used a "shot" of methamphetamine daily. Stennerson was later indicted on the two federal charges at issue here: (1) possessing a firearm as an unlawful drug user, 18 U.S.C. § 922(g)(3), and (2) illegal receipt of a firearm by a person under indictment, 18 U.S.C. § 922(n).

Stennerson moved to dismiss his federal indictment, arguing that § 922(g)(3) and § 922(n) both facially violate the Second Amendment and that § 922(g)(3) is unconstitutionally vague as applied to him. The district court denied Stennerson's motion.

On the facial challenges, the district court concluded that our prior decisions in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), and *United States v. Dugan*, 657 F.3d

998 (9th Cir. 2011), which upheld §§ 922(g)(1) and (g)(3), respectively, were not "clearly irreconcilable" with *Bruen*. The district court reasoned that these decisions relied on the Supreme Court's statement in *District of Columbia v. Heller* that it was not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," 554 U.S. 570, 626 (2008), and that *Bruen* did not disrupt that aspect of *Heller*. The district court also concluded that § 922(g)(3) and § 922(n) are consistent with our nation's long-standing practice of "disarming the unvirtuous citizens (i.e. criminals)." *Vongxay*, 594 F.3d at 1118 (citation omitted).

The district court also rejected Stennerson's vagueness challenge to § 922(g)(3). It concluded Stennerson had not shown that he lacked sufficient notice that his conduct violated the statute where he had a pending state charge for drug possession and admitted to using methamphetamine daily.

After the district court denied his motion to dismiss, Stennerson entered a conditional plea that preserved his right to appeal the ruling on his motion to dismiss. Stennerson timely appealed after he was sentenced and judgment was entered.

## DISCUSSION

We review de novo the denial of a motion to dismiss an indictment that challenges the constitutionality of the statute under which the defendant was charged. *United States v. Howald,* 104 F.4th 732, 736 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 781 (2024). We also review de novo as-applied challenges asserting that the charging statute is unconstitutionally vague. *United States v. Hudson*, 986 F.3d 1206, 1210 (9th Cir. 2021).

## I.   Section 922(g)(3)

As relevant here, § 922(g)(3) prohibits persons who are unlawful users of, or who are addicted to, a controlled substance from "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." We address in turn Stennerson's challenges that this statute is facially unconstitutional and unconstitutionally vague as applied to him because he lacked sufficient notice that his conduct violated the statute.[1]

### A.   Facial Challenge

Challenging a statute as facially unconstitutional is the "'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the [law] would be valid.'" *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "[T]he Government need only demonstrate that [the law] is constitutional in some of its applications" to prevail. *Id.*

Our analysis of the Second Amendment is rooted in the constitutional text and in our nation's history and tradition

---

[1] At oral argument, Stennerson's counsel asserted that Stennerson separately challenges the constitutionality of § 922(g)(3) as applied to the facts of his case. But counsel could not identify any citation to the record establishing that this as-applied challenge was presented to the district court or where this issue was addressed in Stennerson's Opening Brief on appeal. Rather, counsel cited to materials addressing the vagueness challenge and suggested that an as-applied challenge was preserved because Stennerson briefed the facts of his case. On this record, we conclude Stennerson has forfeited an as-applied challenge to § 922(g)(3) separate from his vagueness challenge. *See, e.g.*, *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148 (9th Cir. 2016) ("We generally do not consider issues that are not raised in the appellant's opening brief.").

of firearm regulation. *Bruen*, 597 U.S. at 24. We start by analyzing whether "the Second Amendment's plain text" covers the regulated conduct at issue. *Id.* If it does, "the Constitution presumptively protects that conduct." *Id*. This presumption can be overcome only if "'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 27 (quoting *Heller*, 554 U.S. at 631).

### 1. Constitutional Text

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It is well established that the right "to keep and bear Arms" protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. As indicated, § 922(g)(3) prohibits someone who is "an unlawful user of or addicted to any controlled substance" from possessing firearms. Because § 922(g)(3) is a categorical ban on possession of firearms, there is no question that it implicates the ability "to keep and bear Arms." *Bruen*, 597 U.S. at 32. But we must also consider whether Stennerson is part of "the people" who have Second Amendment rights.

In *United States v. Perez-Garcia*, we noted a "lingering ambiguity" in Supreme Court precedent about who is included in "the people" referenced in the Second Amendment. 96 F.4th 1166, 1178 (9th Cir. 2024). After considering the "six other provisions of the Constitution that mention 'the people,'" the Supreme Court stated in *Heller*: "We start . . . with a strong presumption that the Second Amendment right . . . belongs to all Americans." 554 U.S. at 580–81. But later in that analysis, the Court stated that "whatever else [the Second Amendment] leaves to future

evaluation, it surely elevates above all other interests the right *of law-abiding, responsible citizens* to use arms in defense of hearth and home," *id.* at 635 (emphasis added); *see also id.* at 644 (Stevens, J., dissenting) ("The Court offers no way to harmonize its conflicting pronouncements [about who is included in 'the people'].").

In *Bruen*, the Court similarly announced both that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms," 597 U.S. at 70, and that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen" to possess firearms for self-defense both inside and outside the home, *id.* at 8–10; *see also id.* at 26. And most recently, in *Rahimi*, the Court reiterated that it uses "the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," but it declined to adopt the rule advanced by the government that *only* responsible citizens have Second Amendment rights. 602 U.S. at 701–02.

We waded into the conversation about who is included in "the people" who hold Second Amendment rights in *Perez-Garcia.* At issue there was a Second Amendment challenge to a pretrial-release condition prohibiting possession of firearms. 96 F.4th at 1171. We held that pretrial releasees "are among 'the people' within the meaning of the Second Amendment's 'bare text,'" because "to allow the government to exclude an entire group of individuals from 'the people' through mere accusation would be, at minimum, inconsistent with the presumption of innocence." *Id.* at 1180 (citation modified). And more recently, our en banc court embraced *Heller*'s presumption and held that those "who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" are

part of "the people" who have Second Amendment rights. *United States v. Duarte*, 137 F.4th 743, 752 (9th Cir. 2025) (en banc) (quoting *Heller*, 554 U.S. at 580).[2]

This approach accords with that taken by some of our sister circuits. *See United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) ("Marijuana user or not, [defendant] is a member of our political community and thus has a presumptive right to bear arms."); *United States v. Goins*, 118 F.4th 794, 798 (6th Cir. 2024) (recognizing that "felons are among 'the people' protected by the Second Amendment"); *United States v. Veasley*, 98 F.4th 906, 910 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 304 (2024) (explaining "drug users 'are part of "the people" whom the Second Amendment protects'" (quoting *Bruen*, 597 U.S. at 31–32)).

Under our precedent, Stennerson clearly is part of our national community. Thus, the plain text of "the Second Amendment presumptively protects [his] proposed course of conduct" of possessing a firearm. *Perez-Garcia*, 96 F.4th at 1181.

## 2. History & Tradition

Because the Second Amendment applies, the Government must overcome the presumption that Stennerson's possession of firearms is constitutionally

---

[2] The Government relies on our statement in *Vongxay* that "most scholars of the Second Amendment agree that the right to bear arms was inextricably tied to the concept of a virtuous citizenry." 594 F.3d at 1118 (citation modified). However, we backed away from that pronouncement in *Duarte*, recognizing that there are "conflicting interpretations of history" about who is included in "the people," and, as just explained, adopted *Heller*'s presumption that all persons who are part of the national community are included. 137 F.4th at 754.

protected by establishing that § 922(g)(3)'s restriction on gun possession by users of illegal drugs is supported by our "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This inquiry requires "reasoning by analogy." *Id.* at 28. We consider whether § 922(g)(3) "is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (alteration in original) (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the [Second Amendment] right are central to this inquiry." *Id.* If historical laws "regulated firearm use to address particular problems, that [is] a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*. But "[e]ven when a [modern] law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* And even "when a [modern law] does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id* (quoting *Bruen*, 597 U.S. at 30). The modern law "need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). In assessing whether a modern law is sufficiently analogous to historical regulation, "we do not isolate each historical precursor and ask if it differs from the challenged regulation in some way." *Perez-Garcia*, 96 F.4th at 1191.[3]

---

[3] The Government argues that we must take a "nuanced approach" to analyzing the relevant regulatory history here because the problem arising from modern drug use implicates "unprecedented societal concerns." This argument is based on the statement in *Bruen* that some "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*,

In *Rahimi*, the Supreme Court addressed two sets of historical laws when addressing the constitutionality of § 922(g)(8): surety laws and going-armed laws. 602 U.S. at 695–98. Surety laws empowered a judge to require individuals "suspected of future misbehavior to post a bond." *Id.* at 695. They "also targeted the misuse of firearms" by requiring surety bonds for armed individuals. *Id* at 696. Similarly, going-armed laws punished individuals who carried arms to terrify ordinary citizens with forfeiture of arms and imprisonment. *Id.* at 697. From this history, the Supreme Court reasoned that "surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698.

Similarly, in *Perez-Garcia*, we recognized that "[w]hile the [1688–89 English] Bill of Rights condemned the disarming of 'good subjects,' it allowed the disarming of irresponsible ones." 96 F.4th at 1187. We also explained that this Bill of Rights did not "displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged 'dangerous to the Peace of the Kingdom.'" *Id.* (citation omitted); *see also* The Privy Council to Lord Newport (Jan. 8, 1661), *in* 4 Transactions of the Shropshire Archaeological and Natural History Society 156, 156 (1904)

---

597 U.S. at 27. However, the Supreme Court has not indicated that in counseling a "nuanced approach" for harder cases it was creating a different standard from the otherwise applicable "relevantly similar" analysis. *See Rahimi*, 602 U.S. at 692 (defining *Bruen*'s historical-analogue standard as an inquiry into whether the challenged law is "'relatively similar' to laws that our tradition is understood to permit" without referencing a "nuanced approach"). And here, we conclude that whatever is meant by "nuanced approach," it makes no difference to the outcome of this case.

(suggesting disarmament of individuals who "disturbed the Public peace" was permissible). Use of the Militia Act provisions allowing search and seizure of weapons from disaffected persons "continued unabated" after the adoption of the English Bill of Rights. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019). Thus, the English Bill of Rights permitted disarming those who could not use arms lawfully and responsibly.

Founding-era laws prohibited intoxicated persons from possessing or discharging firearms, but not always for the same reason. For example, a 1655 Virginia law made it unlawful for a person to "shoot any gunns at drinkeing." Acts of Mar. 10, 1655, Act XII, *reprinted in* 1 The Statutes At Large: Being A Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619, at 393, 401–02 (William Waller Hening ed., 1823). But "Virginia passed this statute explicitly as a gunpowder preservation measure (which was at a premium), and because ill-timed gunshots could be mistaken as a signal that Natives were attacking." *Connelly*, 117 F.4th at 280; *see also id.* n.5 (analyzing the statutory language). Thus, not only was the *why* for this statute different than for § 922(g)(3), the *how* was also different: the historical regulation "did not ban gun carry or even possession—it only prevented colonists from misusing the guns they did have *while they were drinking*." *Id.*

A 1771 New York law banned citizens from firing guns during New Year's celebrations. Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 The Colonial Laws of New York from the Year 1664 to the Revolution 244 (1894) [hereinafter New York Law of 1771]. This law had "a similar purpose as

§ 922(g)(3)—preventing the 'great Damages' done by those 'intoxicated with Liquor.'" *Connelly*, 117 F.4th at 280 (quoting New York Law of 1771, *supra*, at 244). But how it regulated was quite different from § 922(g)(3) because it prevented only use, not possession, of firearms, and for only three days per year around the New Year's holiday. *See* New York Law of 1771, *supra*, at 244–45.

The Government also cites laws regulating intoxication and militia service. For example, a 1746 New Jersey statute authorized disarming soldiers who appeared for militia service "disguised in Liquor." Act of May 8, 1746, ch. 200, *in* Acts of the General Assembly of the Province of New Jersey 139, 140 (Samuel Allinson ed., 1776). Several states also prohibited the sale of strong liquor near militia-training locations. *See Wolford v. Lopez*, 116 F.4th 959, 985 (9th Cir. 2024) ("[A] 1756 Delaware law prohibited the militia from meeting within half a mile from a tavern and prohibited the sale of liquor at any militia meeting; and a 1756 Maryland law prohibited the sale of liquor within five miles of a training exercise for the militia."). Additionally, Rhode Island excluded "common drunkards" from the militia entirely. An Act to Regulate the Militia, 1844, *in* Public Laws of the State of Rhode Island and Providence Plantations, as Revised by a Committee, and Finally Enacted by the General Assembly at the Session in January, 1844, at 501, 503 (1844).

After the founding, states and localities continued to disarm intoxicated individuals. Several states banned "the carry of firearms while intoxicated," including "Kansas in 1867, Missouri in 1883, and Wisconsin in 1883." *Wolford*, 116 F.4th at 985. In 1886, the Missouri Supreme Court upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be

apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). And other cities and states prohibited possession of a firearm in locations where alcohol would be sold. *See Wolford*, 116 F.4th at 987 (New Mexico in 1853, San Antonio, Texas in 1870, and Oklahoma in 1890).

Taken together, our nation's tradition of firearms regulation at least supports restricting possession of firearms by those who are presently intoxicated and, therefore, hindered in their ability to exercise sound judgment and self-control. Thus, we hold that § 922(g)(3) is facially constitutional because in at least these circumstances, the restriction that it imposes "is consistent with the Nation's historical tradition of firearm regulation."[4] *Bruen*, 597 U.S. at 24.

We are not alone in reaching this conclusion. Both the Fifth and Eighth Circuits have held that § 922(g)(3) is facially constitutional because "our history and tradition of firearms regulation show that there are indeed some sets of circumstances where § 922(g)(3) would be valid." *Connelly*, 117 F.4th at 282; *see Veasley*, 98 F.4th at 918 ("[A]t least some drug users and addicts fall within a class of people who historically have had limits placed on their right to bear arms."); *United States v. Cooper*, 127 F.4th 1092, 1096 (8th Cir. 2025) (suggesting that § 922(g)(3) may be

---

[4] Before *Bruen*, we upheld § 922(g)(3), reasoning in part that "[b]ecause Congress may constitutionally deprive felons and mentally ill people of the right to possess and carry weapons, . . . Congress may also prohibit illegal drug users from possessing firearms." *Dugan*, 657 F.3d at 999–1000. However, we cannot rest on *Dugan* because we undertook no historical analysis of these issues, as *Bruen* and *Rahimi* now require. But we nonetheless arrive at the same outcome as relates to this facial challenge.

constitutionally applied to marijuana users in at least some applications). We note that these circuits have also concluded that § 922(g)(3) may be challenged on an as-applied basis because its possessory restriction is far broader than historical analogues. The Fifth Circuit explained that certain historical regulations "address a comparable problem—preventing intoxicated individuals from carrying weapons—but they do not impose a comparable burden on the right holder." *Connelly*, 117 F.4th at 281. Similarly, the Eighth Circuit stated that "[t]he fact that earlier generations addressed the societal problem through materially different means is evidence that disarming *all* drug users, simply because of who they are, is inconsistent with the Second Amendment." *Veasley*, 98 F.4th at 912 (citation modified) (quoting *Bruen*, 597 U.S. at 26).

We have not addressed whether an as-applied challenge could succeed against 922(g)(3). In *Duarte*, which concerned a conviction under § 922(g)(1) (prohibiting felons from possessing firearms), we rejected the contention that the historical record does not support a possessory ban as applied to all felons, including those convicted for nonviolent offenses, and we concluded that assurances made in *Heller*, *Bruen*, and *Rahimi* about certain categories of restrictions not being called into doubt indicated that there is "a historical tradition of firearm regulation that supports the categorical application of § 922(g)(1) to [all] felons." *Duarte*, 137 F.4th at 752. As Stennerson has not brought an as-applied challenge to § 922(g)(3), we have no occasion to consider whether such a challenge could succeed, or whether this statute is also categorically constitutional. We leave that issue for another day.

## B.  Vagueness Challenge

Stennerson contends that § 922(g)(3) is also unconstitutionally vague as applied to him. "A criminal law is unconstitutionally vague if it fails to 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Lemus*, 93 F.4th 1255, 1261 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 581 (2024) (quoting *Beckles v. United States*, 580 U.S. 256, 262 (2017)). "In an as-applied challenge, a statute is unconstitutionally vague if it fails to put a defendant on notice that his conduct was criminal." *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013) (citation modified) (citation omitted). Statutory vagueness challenges that "do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *Id.* (citation omitted).

Section 922(g)(3) provides:

> It shall be unlawful for any person . . . who is *an unlawful user of or addicted to any controlled substance* (as defined in section 102 of the Controlled Substances Act) . . . *to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm* or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(3) (emphases added). There is no dispute that Stennerson received a firearm. It is also undisputed that he admitted to being an addict who used "a shot a day" of

methamphetamine at the time of his arrest.[5] The only question is whether § 922(g)(3) provided sufficient notice that the "manner and extent" of Stennerson's drug use subjected him to prosecution under § 922(g)(3). *United States v. Purdy*, 264 F.3d 809, 812 (9th Cir. 2001).

Our prior decisions in *United States v. Ocegueda*, 564 F.2d 1363 (9th Cir. 1977), and *Purdy* are instructive. In *Ocegueda*, the defendant was convicted of receiving firearms while he was an active heroin user. 564 F.2d at 1364. On appeal, he challenged his conviction, arguing that the "unlawful user" restriction was unconstitutionally vague as applied to him. *Id.* at 1364–65. We rejected Ocegueda's challenge and explained, "a common sense meaning of the phrase clearly includes [Ocegueda's] conduct" because heroin use "by laymen is not permissible in any circumstance" and the evidence established that he was using heroin "before, during and after the period of the gun purchases." *Id.* at 1365–66. We also concluded "the statutory history" showed that § 922(g)(3) was enacted "to keep firearms out of the hands of those not legally entitled to possess them because of . . . [their] criminal background." *Id.* at 1365. Ocegueda's prolonged and unlawful use of heroin therefore fell within the conduct covered under § 922(g)(3). *Id.* at 1366.

Relying on *Ocegueda*, we likewise rejected a vagueness challenge to § 922(g)(3) in *Purdy*. In that case, the defendant "had used illegal drugs—cocaine, methamphetamine, and marijuana—on a regular basis for years, and . . . had smoked

---

[5] Methamphetamine is defined as a controlled substance under federal law. *See* 21 U.S.C. §§ 802, 812, scheds. II, III.

methamphetamine and marijuana contemporaneously with his possession of a firearm." 264 F.3d at 812.

This case demands the same result. Stennerson's "drug use was sufficiently consistent, 'prolonged,' and close in time to his gun possession to put him on notice that he qualified as an unlawful user of drugs under § 922(g)(3)." *Id.* (quoting *Ocegueda*, 564 F.2d at 1365). Indeed, he admitted to being an "addict" and using methamphetamine daily during the relevant period. Again, we are in accord with our sister circuits in reaching this result. *See United States v. Cook*, 970 F.3d 866, 877 (7th Cir. 2020) (noting "[t]he *uniform rejection* of as-applied vagueness challenges to section 922(g)(3)" and concluding that "simply because it may sometimes be difficult to determine if an individual's drug use meets section 922(g)(3)'s standard for liability does not signify that the statute is impermissibly vague" (emphasis added)); *United States v. Morales-Lopez*, 92 F.4th 936, 945–46 (10th Cir. 2024) (rejecting vagueness challenge because a person of "ordinary intelligence" would have understood the defendant's conduct violated § 922(g)(3) where the evidence allowed a reasonable inference to be drawn that the defendant's drug use was "regular and ongoing"); *United States v. Hasson*, 26 F.4th 610, 616–21 (4th Cir. 2022) (holding that section 922(g)(3) was not impermissibly vague as applied to a defendant whose alleged conduct fell squarely within statute's confines).

Stennerson argues that courts using different descriptors to explain what qualifies someone as an "unlawful user" is proof that the statute is impermissibly vague. *Compare, e.g.*, *Purdy*, 264 F.3d at 813 (holding the government must prove the defendant "took drugs with *regularity*, over an extended period of time" (emphasis added)) *with United States v. Edmonds*, 348 F.3d 950, 953 (11th Cir. 2003) (per curiam)

(holding a defendant's drug use must be "*ongoing*"). Similarly, he argues that "courts have invented various temporal nexus requirements between illicit drug use and the possession of a firearm to avoid vagueness problems." *Compare, e.g.*, *Purdy*, 264 F.3d at 813 (requiring *contemporaneous* use with firearm possession) *with Hasson*, 26 F.4th at 616 (requiring *close in time* use with firearm possession). We are unpersuaded. That different courts use synonyms to define the conduct that renders someone an unlawful drug user in possession of a firearm does not mean that they have adopted different standards.

We are also unconvinced by Stennerson's assertion that "[t]he facts of this case are markedly different from others where[] [as-applied] challenges were rejected." Although Stennerson cites cases where defendants used controlled substances for a longer period or possessed more firearms, that does not undermine our conclusion that Stennerson's conduct here falls within the range of conduct covered under § 922(g)(3).[6]

---

[6] To the extent Stennerson argues that § 922(g)(3) is unconstitutionally vague *on its face*, this contention necessarily fails due to our conclusion that § 922(g)(3) is not unconstitutionally vague as applied in this case. *See United States v. Hudson*, 986 F.3d 1206, 1214 n.3 (9th Cir. 2021) ("Absent exceptional circumstances, a defendant who cannot sustain an as-applied vagueness challenge to a statute cannot be the one to make a facial vagueness challenge to the statute.") (internal quotations and citation omitted). Stennerson's argument that *Johnson v. United States*, 576 U.S. 591, 597–98 (2015), established that a facial vagueness can survive even if there are as-applied circumstances that do raise vagueness concerns is misplaced. *See United States v. Hasson*, 26 F.4th 610, 620 (4th Cir. 2022) (holding *Johnson* "did not silently overrule [Supreme Court] precedents prohibiting vagueness challenges by those whose conduct a statute clearly prohibits."); *United States v. Cook*, 970 F.3d 866, 877 (7th Cir. 2020) ("*Johnson* did not alter the general rule

## II.  18 U.S.C. § 922(n)

Finally, Stennerson argues that the second statute under which he was charged—18 U.S.C. § 922(n)—is facially unconstitutional.

### A.  Constitutional Text

Section 922(n) makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition." 18 U.S.C. § 922(n). As previously discussed, Stennerson is part of "the people" who have Second Amendment rights, and the prohibition on receipt of a firearm while under indictment meaningfully constrains his right to keep and bear arms. *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025); *see also Nguyen v. Bonta*, 140 F.4th 1237, 1241 (9th Cir. 2025) ("[W]e have consistently held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." (citation modified)). Thus, the plain text of the Second Amendment applies, and the Government must "justify its regulation" by showing that disarming persons who are under felony indictment is consistent with the nation's "historical tradition of firearm regulation." *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 17, 24).

---

that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge."). *Johnson* involved interpretation of the Armed Career Criminal Act's residual clause, which required us to look not at the actual conduct underlying the defendant's prior conviction but rather at the "*archetypal version* of the offense." *Cook*, 970 F.3d at 876 (citing *Johnson*, 576 U.S. at 597–98). By contrast, here the vagueness challenge is "much more routine" and concerns Stennerson's *actual* conduct.  *Id.*

### B. History & Tradition

The Government argues that the historical analysis for § 922(n) is "considerably simplified" by *Perez-Garcia* because prohibiting a person under felony indictment from receiving firearms is analogous to disarming pretrial detainees. In *Perez-Garcia*, we analyzed the Bail Reform Act, which "authorizes federal courts to release defendants awaiting trial subject to specific conditions that 'protect the community from the risk of crimes [they] might commit while on bail.'" 96 F.4th at 1175 (alteration in original) (citation omitted). Some conditions burden constitutional rights "to personal association, travel, speech directed at a victim or witness, or, at issue here, the possession of firearms." *Id.* (citing 18 U.S.C. § 3142 (c)(1)(B)(i)-(xiv)). In *Bruen*'s terms, the "why" for the Bail Reform Act's restrictions is to "reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* at 1182 (quoting 18 U.S.C. § 3142 (c)(1)(B)). And "how" it reaches its safety goals is "a complete, albeit temporary and individually tailored, prohibition on the right to bear arms." *Id.* at 1181–82.

In upholding the Bail Reform Act's restrictions, we concluded that three "separate but related founding era practices" support temporarily disarming defendants facing serious criminal charges: "(1) most serious crimes were eligible for capital charges; (2) the government had the power to detain, and usually did detain, defendants indicted on capital charges; and (3) once detained, criminal defendants were completely disarmed." *Id.* at 1182. Even though pretrial detention was not uniformly imposed, "pretrial release was *far rarer in the founding era than it is today* because the founding generation generally did not allow defendants facing capital charges to be released

pending trial, and most serious criminal acts and felonies constituted capital offenses." *Id.* at 1183 (emphasis added). Indeed, "[a]t the time of the Second Amendment's ratification, for example, nonviolent crimes such as forgery and horse theft were capital offenses." *Id.* (citing *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)).

We also held that "our nation's history of barring people or groups deemed dangerous or unlikely to respect the sovereign's authority from possessing firearms" was "a separate ground" for upholding the Bail Reform Act. *Id.* at 1186. We reasoned that many laws, from the English Bill of Rights to the Militia Act of 1662 to colonial era statutes disarming Catholics and other groups perceived to be disloyal, showed a history and tradition of the "legislative authority to disarm groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen." *Id.* at 1186–89; *see also Duarte*, 137 F.4th at 759–61.

If our regulatory history and tradition support *banning possession* of firearms while a defendant awaits trial, we are hard pressed to see how they do not also support prohibiting those under felony indictment from *receiving* firearms. The "why" of both restrictions (and historical pretrial practices for serious offenses) is to further public safety and protect the integrity of the criminal process between indictment and trial. *See United States v. Gore*, 118 F.4th 808, 814–15 (6th Cir. 2024). And "how" these goals are achieved is at least partly less burdensome under § 922(n) because it restricts only *receipt* of firearms and does not ban possession of previously acquired firearms (or impose physical detention). *Id.*; *Veasley*, 98 F.4th at 915.

Admittedly, *Perez-Garcia* does not definitively resolve whether § 922(n) imposes a comparable burden as the relevant historical laws. The Bail Reform Act requires individualized assessment of the likelihood of dangerousness. *See Perez-Garcia*, 96 F.4th at 1171, 1181, 1189–90. But on a facial challenge, this distinction is immaterial. The history and tradition outlined in *Perez-Garcia* supports that legislatures could disarm "groups" of people without any individualized determination. *Id.* at 1186, 1189; *see also Duarte*, 137 F.4th at 759–61 (outlining similar history and concluding that this tradition "reveals that legislatures were permitted to categorically disarm those they deemed dangerous without having to perform 'an individualized determination of dangerousness as to each person in a class of prohibited persons.'" (citation omitted)).

Recently, two other circuits have also upheld § 922(n) against facial attacks. The Sixth Circuit held that "Section 922(n)'s prohibition is comparable to the founding-era history of pretrial detention 'in both why and how it burdens the Second Amendment right.'" *Gore*, 118 F.4th at 815 (quoting *Rahimi*, 602 U.S. at 698). Specifically, that court explained that both restrictions were imposed to protect public safety and the criminal process, they applied during the same time period—from indictment through trial, they apply only to serious offenders, and § 922(n) imposes a lesser burden than historical pretrial detention practices. *Id.* The court also noted that *Rahimi* "was careful not to 'suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse.'" *Id.* at 816 (quoting *Rahimi*, 602 U.S. at 698). Moreover, in § 922(n), Congress "defined, by their circumstances, a category of persons who, in its judgment,

present special risks. And that categorical judgment is comparable to founding-era approaches to pretrial detention." *Id.*

The Fifth Circuit also held that § 922(n) "'fits neatly' within our nation's historical tradition of protecting the public from criminal defendants indicted for serious offenses." *United States v. Quiroz*, 125 F.4th 713, 723–24 (5th Cir. 2025) (footnote omitted). That court reasoned that "the modern purpose of § 922(n) is relevantly similar to the historical purpose of pretrial detention." *Id.* at 718–19 (citing *Perez-Garcia*, 96 F.4th at 1184). And it noted "it could be said that § 922(n) places a lesser burden on Second Amendment rights" than the relevant historical analogues. *Id.* at 719.

Stennerson argues that the historical record does not support § 922(n)'s restriction because it applies to many more offenses than triggered pretrial detention at the founding. There is no question that what constitutes a felony under modern law is much broader than what constituted a serious offense triggering pretrial detention at the founding. *See Tennessee v. Garner*, 471 U.S. 1, 14 (1985) ("Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies."). But Stennerson brought a facial challenge to § 922(n), and therefore he must "establish that no set of circumstances exists under which the [statute] would be valid." *Rahimi*, 602 U.S. at 693 (citation omitted). This he cannot do. Given our decision in *Perez-Garcia* that the historical record supports complete pretrial disarmament, § 922(n)'s lesser burden on Second Amendment rights is at least constitutional as applied to those indicted for offenses that triggered pretrial detention at the founding. *See United States v. Holden*, 70 F.4th 1015, 1018 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 400 (2023) ("Even if some applications of

§ 922(n) would flunk the constitutional standard (say, someone under indictment for an antitrust offense), others might illustrate the sort of person who cannot be trusted with guns."). "The Government need not go further and dig up an 18th century law under which [Stennerson], specifically, would have been disarmed while awaiting trial for crimes like unlawful possession" of methamphetamine at this point in the litigation. *Perez-Garcia*, 96 F.4th at 1185–86.

**AFFIRMED.**